Lisa S. Kantor, State Bar No. 110678
  *lkantor@kantorlaw.net*
J. David Oswalt, State Bar No. 73439
  *jowsalt@kantorlaw.net*
Timothy J. Rozelle, State Bar No. 298332
  *trozelle@kantorlaw.net*
KANTOR & KANTOR, LLP
19839 Nordhoff Street
Northridge, CA 91324
Telephone: (818) 886-2525
Facsimile:  (818) 350-6272

Attorneys for Plaintiff,
Sovereign Asset Management, Inc.

KANTOR & KANTOR LLP
19839 Nordhoff Street
Northridge, California 91324
(818) 886 2525

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### WESTERN DIVISION

| | |
|---|---|
| SOVEREIGN ASSET MANAGEMENT, INC., | ) Case No.: |
| Plaintiff, | ) **COMPLAINT FOR** |
| vs. | ) **INTENTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMNIC ADVANTAGE** |
| HEALTH NET LIFE INSURANCE COMPANY; CENTENE CORPORATION; | ) **PUNITIVE DAMAGES** |
| Defendants. | ) **DEMAND FOR  JURY** |

COMPLAINT

**PARTIES**

1.     Plaintiff Sovereign Asset Management, Inc. ("Sovereign") is a corporation duly organized and existing under the laws of Delaware, doing business as "Sovereign Health Group."

2.     In December 2008, Sovereign purchased and became the sole owner of Dual Diagnosis Treatment Center, Inc. ("Dual Diagnosis"), a corporation organized and existing under the laws of California.  Dual Diagnosis does business as "Sovereign Health of California" and on occasion under other names as permitted by law.  Dual Diagnosis operated and maintained behavioral health treatment facilities in California, and is the parent company of other entities which operate and maintain behavioral health treatment centers in Orange County, California, and in other states around the country, including Arizona, Texas, and Florida.  Collectively these entities and facilities are referred to as the "Sovereign entities" and the "Sovereign facilities."

3.     Defendant Health Net Life Insurance Company ("Health Net") is a California corporation with its principal place of business at 21281 Burbank Boulevard, Building B3, Woodland Hills, California.  Health Net sells individual health insurance policies in California.

4.     Defendant Centene Corporation is a Fortune 500 company with its headquarters in St. Louis, Missouri.  Centene is the parent company of Health Net.  Centene also has an office in Woodland Hills, California.

5.     Manatt, Phelps and Phillips, LLC ("Manatt") is a law firm which advertises itself as a "multidisciplinary, integrated national professional services firm."  It has offices in Los Angeles, Orange County, Palo Alto, San Francisco, Sacramento, New York, Albany, Chicago and Washington, D.C.  Kenneth B. Julian is a partner in Manatt's Orange County office.  Immediately prior to becoming a partner at the Manatt law firm, Julian was a deputy chief in the Orange County office of the U.S. Attorney for the Central District of California. John LeBlanc is a partner

KANTOR & KANTOR LLP
19839 Nordhoff Street
Northridge, California 91324
(818) 886 2525

in Manatt's Los Angeles Office and a co-chair of the firm's national healthcare litigation practice. Ileana Hernandez is a partner in Manatt's Los Angeles Office.

6. Jurisdiction is based on diversity of citizenship pursuant to 28 U.S.C. § 1332. The amount in controversy, exclusive of interest and costs, exceeds the sum of $75,000.00.

7. Defendants reside in this judicial district and much of the conduct that is the subject of this lawsuit occurred within this judicial district. Venue is proper in this judicial district pursuant to 28 U.S.C. §1391 (b)(2) and (c)(2).

8. The Sovereign facilities were award winning providers of comprehensive addiction and mental health treatment programs.

9. At all relevant times, the Sovereign facilities were "out-of-network" health care providers with respect to Health Net. In other words, none of the Sovereign facilities contracted with Health Net to provide behavioral health services to Health Net insureds at a discounted rate pursuant to what is commonly referred to as an "in-network" contract.

## THE ASSIGNEE LITIGATION

10. In 2015 and 2016, Sovereign, through its subsidiaries, admitted and treated over 400 patients who had health insurance policies issued by Health Net. Upon admission, the Sovereign entities verified each patient's benefits and obtained a signed valid Assignment of Benefits.

11. Sovereign and its subsidiaries rendered services to these patients and billed Health Net for those services.

12. However, contrary to the manner in which it had accepted and paid claims for the period 2012 through 2014, Health Net failed and refused to pay for its members' treatment at the Sovereign facilities.

13. As the assignee of the Health Net members' claims, on June 30, 2016, Sovereign filed a lawsuit in Superior Court for the County of Los Angeles against Health Net and related entities. That lawsuit was assigned Case No. LC104357

KANTOR & KANTOR LLP
19839 Nordhoff Street
Northridge, California 91324
(818) 886 2525

KANTOR & KANTOR LLP
19839 Nordhoff Street
Northridge, California 91324
(818) 886 2525

("Assignee litigation").  The Assignee litigation seeks over $55 million in unpaid claims, statutory interest and attorney fees under *Brandt v. Superior Court,* 37 Cal.3d 813 (1985).

14.     This action is brought by Sovereign in its own right, not as assignee of patient claims.  See *Bush v. Superior Court,* 10 Cal.App.4th 1374, 1380 (1992).

## THE HEALTH NET POLICIES

15.     Effective 2014, the Affordable Care Act ("ACA") required health insurance plans, including those sold by Health Net, to provide ten categories of "essential health benefits," including mental health and substance abuse treatment. 42 U.S.C. § 18022.  In addition, under the ACA, states established on-line "exchanges," where the new ACA-compliant plans were marketed. Health Net began marketing its new health insurance plans through these exchanges ("ACA Plans"). As explained below, one unique feature of Health Net's new plans was that out-of-network providers of substance abuse treatment, like Sovereign, would be reimbursed at 75 percent of their billed charges, which was an unusually high reimbursement rate.

16.     The Health Net policies at issue in this action are the 2015 and 2016 individual preferred provider organization ("PPO") policies.  The Health Net 2015 individual PPO health insurance policies provided that the Maximum Allowable Amount to be paid to out of network mental health providers is determined as follows:

> Maximum Allowable Amount for Physician services is determined by applying a designated percentile from the database of Physician charges from the FAIR Health RV Benchmarks or a similar type of database of Physician charges.
>
> For all other types of services, Maximum Allowable Amount is determined by applying a percentage of what Medicare would allow

KANTOR & KANTOR LLP
19839 Nordhoff Street
Northridge, California 91324
(818) 886 2525

(known as the Medicare allowable amount).  The Maximum Allowable Amount for such services is 190% of the Medicare allowable amount.

In the event the applicable service or database does not include an amount for the service or supply provided, Maximum Allowable Amount shall be deemed to be 75% of the covered charges billed by the provider.

17.     The Health Net Individual 2016 PPO policies contains an identical provision, except for the "Physician services" section. The 2016 policies provide that "Maximum Allowable Amount for Physician services is determined by applying the 85th percentile from the database of Physician Charges from the FAIR Health RV Benchmarks or a similar type of database of Physician charges."

18.     Medicare does not provide a rate for inpatient, residential or outpatient facility based charges for behavioral health because such facilities are not eligible to participate in Medicare.  Consequently, pursuant to the terms of the Health Net policies, Health Net was required to pay facility claims for inpatient, residential or outpatient treatment based on 75% of the charges billed by the facility.

19.     During 2015 and 2016, Health Net knew that it was required to pay 75% of billed charges submitted by the Sovereign facilities, as it had previously paid such amounts in 2012, 2013, and 2014.

### HEALTH NET PLAN LANGUAGE CAUSES INCREASE IN INSUREDS AND CLAIMS

20.     In 2014 and 2015, Health Net saw dramatic increases in the number of insureds under its individual PPO ACA Plans. As disclosed in Health Net's SEC filings, enrollment in individual plans in Health Net's Western Region, which includes California and Arizona, increased 188.7 percent from year-end 2013 to year-end 2014, from approximately 115,000 members to 332,000 members. In California alone, membership increased 137.0 percent, from approximately 100,000 members to 237,000 members. According to Health Net, this significant increase was primarily

KANTOR & KANTOR LLP
19839 Nordhoff Street
Northridge, California 91324
(818) 886 2525

due to an increase in new individual members from the ACA exchanges in California and Arizona.

21.    Along with this huge increase in the number of insureds, Health Net saw an even more dramatic increase in the number and dollar amount of claims. In its filings with the California Department of Insurance ("DOI"), Health Net disclosed that in 2014 it had earned $233.5 million in premiums for California plans and incurred $345.5 million in claims on those policies. However, in the following year, 2015, Health Net had earned only $189 million in premiums, but had incurred over $473 million in claims, a loss of $287 million.

22.    The increase in the dollar amount of claims related to the treatment of substance abuse was particularly dramatic. According to Health Net's DOI filings, its *paid* substance abuse claims in California increased 1,577 percent from 2014 to 2015. Out-of-network substance abuse claims alone accounted for 42.7 percent of all of Health Net's claims in California in 2015, *i.e.,* $202,385,210 out of a total of $473,970,047.

23.    Why the large amount of out-of-network substance abuse claims? Health Net told the DOI that this was result of a "coding pitfall" in the way out-of-network substance abuse providers were paid under the new Health Net ACA Plans:

In CY 2015, Out-of-Network substance abuse claims consumed 42.7% of the dollars spent for this block of business. Prior to 2016, Out of Network substance abuse claims were paid as a % of billed because a Medicare Allowable rate was not available of this claim category. . .

We have fixed this coding pitfall, which will allow us to establish a reasonable reimbursement rate. This drop in reimbursement rate is expected to reduce OON [out-of-network] substance abuse claims by 80%.

24.    In other words, Health Net told the DOI that it could reduce its out-of-network substance abuse claims, totaling $202 million in 2015, by 80 percent solely

by eliminating the provision that paid out-of-network providers at 75 percent of billed charges.

25.     The dramatic effect of the "coding pitfall" is illustrated by the fact that out-of-network behavioral health claims, which include substance abuse claims, were over 9,000 percent greater in 2015 than in-network behavioral health claims.  Health Net attributed this difference solely to the fact that out-of-network claims were required to be paid at a percentage of billed charges rather than at a much lower negotiated rate it paid to its in-network providers.

## CENTENE – HEALTH NET MERGER

26.     In 2014, Health Net began to explore the possibility of merging with a larger corporation.  In November 2014, Health Net CEO Jay Gellert and Centene CEO Michael Neidorff met for the first time to discuss a potential merger of their companies.  At the initial meeting, they did not discuss financial details of a possible merger.  Health Net apparently spoke with two other interested buyers in the beginning of 2015, but those negotiations were not fruitful.

27.     After Health Net reported an increase in insureds and a positive financial report in early 2015, Centene re-initiated merger discussions with Health Net, and negotiations began in earnest in June 2015. On July 2, 2015, Health Net announced that it had entered into a merger agreement with Centene under which Centene would acquire 100% of Health Net.

28.     In October 2015, Health Net's stockholders voted to approve the adoption of the merger agreement with Centene.  When the deal was finalized, it was valued at $6.8 billion.  Health Net's CEO received a golden parachute worth $54,000,000.00 and its CFO received a golden parachute worth $23,400,000.00.

29.     In March 2016, the California DOI concluded its review of the merger and granted conditional approval, mandating that Centene keep Health Net's individual plans on Covered California, that Health Net ensure its networks of providers was adequate to meet the needs of its insureds, and that Health Net make

KANTOR & KANTOR LLP
19839 Nordhoff Street
Northridge, California 91324
(818) 886 2525

efforts to improve its ratings on the "report card" issued to it by California Office of Patient Advocacy.

## HEALTH NET CLAIMS FORCE CENTENE TO REPORT INCREASED LIABILITIES AND ADMIT DESIGN FLAWS IN HEALTH NET POLICIES

30.     In July 2016, after the effective date of its merger with Health Net, Centene was forced to disclose to its shareholders that Health Net had incurred $390 million in liabilities, which existed as of the March 24, 2016 merger date, but had not been properly accounted for and disclosed. At least $140 million of the undisclosed liabilities related to substance abuse claims in California. The increased liabilities were greater than Health Net's entire pre-tax annual earnings for any of the prior five years. The acknowledgment by Centene of the undisclosed liabilities and their impact on Health Net's earnings made it abundantly clear to Centene's shareholders that the amount Centene had paid to purchase Health Net had been predicated on vastly overstated historical earnings by Health Net. Centene auditors required it to report these increased liabilities in filings with the U.S. Securities and Exchange Commission. Further, its reporting of Health Net's revenue and income had to be drastically reduced. This prompted Centene and Health Net to seek approval from the DOI to both increase premiums, and to alter plan terms, which changes included reductions in reimbursement rates for out of network providers.

31.     Centene and Health Net worked feverishly to control the negative publicity resulting from the required disclosure of accurate financial information. For instance, on July 26, 2016, during a conference call with numerous financial analysts whose opinions were critical to maintaining Centene's stock price,  Centene CFO Jeffrey Schwaenke, discussing losses resulting from Health Net-related substance abuse treatment claims in California said, "[w]e have taken steps to mitigate the substance abuse treatment center cost in the individual commercial business in California including modifications to plan design," and that Centene was "actively

KANTOR & KANTOR LLP
19839 Nordhoff Street
Northridge, California 91324
(818) 886 2525

working" with the CDI to "ensure we maintain a competitive individual commercial product in 2017."

32.    Centene CEO Michael Neidorff added in that same analyst call that Centene was meeting with the California Insurance Commissioner and was "being very aggressive in fixing it." He explained further that Centene was "working with the state at the highest levels to redesign the PPO product. There were major flaws in it, and we corrected that. There's a combination of correcting it and ensuring that it's competitive, ensuring that it attracts a balanced book of business." Later on during the same conference call, he reiterated that "[t]he issue is the certificates of coverage and they are being changed for 2017," so that "the behavioral issue is being dealt with with [sic] the benefit designs."  Mr. Neidorff explained that the Health Net PPO plans had "product design issues," but insisted "we're bringing the product design in line." Referring again to the discussions with CDI regarding the PPO redesign, he said "[w]e're closing – I don't want to call it loopholes – some openings that the state understands."

33.    Moreover, on July 28, 2016, during an appearance on the CNBC show, "Mad Money," Mr. Neidorff responded to a question regarding losses in Health Net's California business by stating, "we have an issue there, we're working very closely with the Department of Insurance … that the individual PPO had a bad product design. And we knew that, and we've already submitted the changes, effective January 1 of '17. They're gonna be fully approved, so it's a competitive product."

34.    Further, during another analyst call on October 23, 2016. Mr. Neidorff returned to the issue of the design flaws in Health Net's individual PPO plans and Centene's efforts to fix them. He detailed some of the key changes, including "the first time inclusion of an out-of-network deductible for platinum and gold plans," a "significant increase in the out-of-network maximum out-of-pocket level," the "elimination of non-emergent out-of-state coverage and travel network access," the "elimination of the default rate of 75% of billed charges to out-of-network services

KANTOR & KANTOR LLP
19839 Nordhoff Street
Northridge, California 91324
(818) 886 2525

that do not have a Medicare rate," and "restrictions on third-party premium payments, which were not included in the original 2016 offering."  Mr. Neidorff said, "[t]he previous design I would almost characterize as an inexpensive indemnity-type product. And it was a loss for Health Net in 2015 as well, we knew that."

35.    Speaking further about Health Net's PPO plan prior to 2017, Mr. Neidorff said, "when you look at all the products associated with it, the out-of-network coverage, the benefit design they had before without the Medicare Maximum and the other issues where there was a percent of billed charges, basically out-of-network providers could do what they wanted and we are liable at a time for 75% of billed charges 'til they change their certificate of coverage. So, virtually putting in the changes that I discussed during my formal remarks eliminates the incentives to put people into that product at the same level. … It was a bad design before. The state, everybody recognized it. It's been fully fixed."

36.    In addition, at the Morgan Stanley Global Health Care Conference on September 13, 2016, Mr. Neidorff stated that Centene had "dealt with" its losses and liabilities for Health Net substance abuse treatment claims in California by "chang[ing] the benefit level," and said it was working with the California CDI to "fix the PPO in California." He added, "[t]here were some design flaws that were just so obvious to those of us who have been doing it for a long time. Those have been fixed. The Commissioner has asked to meet as early as this week to try and finalize things . . . If not, we will do it early next week." Mr. Neidorff went on to explain some of the "design flaws" in the Health Net PPO plans that had led to substance abuse treatment claim liability:

> There were not the incentives. A PPO is designed to give people an option to go out of network, but really it should be designed to encourage people to stay in network. This had none of that. There were no caps on maximum allowances. We had the most liberal -- or Health Net had the

KANTOR & KANTOR LLP
19839 Nordhoff Street
Northridge, California 91324
(818) 886 2525

KANTOR & KANTOR LLP
19839 Nordhoff Street
Northridge, California 91324
(818) 886 2525

most liberal PPO out there, which encouraged adverse selection. We knew that when we bought the company. We had done our homework But we knew we had the prior purchase accounting methodology to deal with it.  And we knew what it would take to fix it. And that's just what we have been doing, very methodically. And we're very comfortable. The deductibles will be $5,000 and $10,000, from no deductible. You do things so people will use the in-network. It will be a very competitive -- if we get the changes we want, we will be able to do it with virtually no rate increase.  And it shows you the order of magnitude.

## DEFENDANTS' UNLAWFUL CONDUCT

37.     In the second half of 2015, Health Net and Centene began a systematic campaign to resolve the problem relating to the unprofitable nature the Health Net PPO policies.  Rather than accept the losses which occurred as the result of its own acknowledged plan design flaws, Health Net and Centene instead chose to resolve its financial issues by arbitrarily reducing or eliminating entirely all payments to out-of-network substance abuse providers in California. In November 2015, Health Net's payments to in excess of 1,000 California substance abuse treatment centers became sporadic.  The reduction or elimination of benefit payments was not limited to the Sovereign entities, but was a uniform practice put in place by Health Net and Centene impacting claims submitted by in excess of 1,000 California substance treatment centers.

38.     In January 2016, in what can only be characterized as a fraudulent scheme to avoid having to pay plans in accordance with its own acknowledged "flawed designs," and with no factual basis to do so, Health Net instituted a special investigation unit ("SIU") "audit" of all or substantially all substance abuse treatment centers in California. This audit was directed by John LeBlanc and Ileana Hernandez from Manatt.

39.     In connection with the "audit," Health Net's Director of SIU, Matthew Ciganek, sent boiler plate form letters to in excess of 1,000 treatment centers, which imposed unlawful and onerous burdens on how claims had to be submitted, including requesting extensive and unusual amounts of documentation in a short time frame (15 days).

40.     The letter also stated that Health Net was suspending payment on claims previously submitted and that Health Net was investigating alleged fraudulent practices.  However, the suspension of benefits was contemporaneous with Centene's acknowledgement of both prior Health Net plan design flaws, and its current activity to correct said flaws, and was incontrovertibly a fraudulent scheme to be used as a subterfuge for Health Net to avoid the payment of valid claims, and in so doing avoid the hundreds of millions of dollars in losses which resulted from its own acknowledged plan design.

41.     In putting its fraudulent scheme into effect, Health Net alleged that the act of treatment providers waiving the patients' deductibles, copayments or co-insurance could raise questions regarding false or fraudulent claims.  However, Health Net's 2015 and 2016 ACA Plans were *coinsurance only policies* in which deductible and copayments are not applicable for out-of-network services.  It is impossible for treatment providers to determine (or waive) co-insurance amounts until a claim is paid.  Nevertheless, Health Net and Centene predicated an investigation of fraud involving waiver of co-insurance amounts on claims that had not yet been paid!

42.     Furthermore, as noted above, after the merger closed, Centene CEO acknowledged that Health Net's ACA Plans had "design flaws," and specifically listed as one of the flaws the fact that the plans did not require a co-payment or deductible for out-of-network services. Again, the scheme put in place by Manatt, Health Net and Centene to avoid payment of valid claims through the initiation of a "special investigation" was clearly fraudulent, as it was predicated on practices

KANTOR & KANTOR LLP
19839 Nordhoff Street
Northridge, California 91324
(818) 886 2525

KANTOR & KANTOR LLP
19839 Nordhoff Street
Northridge, California 91324
(818) 886 2525

Health Net and Centene acknowledged were permitted by the terms of Health Net's plans, and which Health Net and Centene advised its shareholders needed to be fixed going forward.

43.    In addition, Health Net stated that eligibility under the PPO policies was limited to individuals who "continually reside" in a defined California area.  But Health Net had the authority to approve or disapprove enrollment applications, a process with which the providers had no involvement. Moreover, under clear California law, Health Net's sole remedy if it made a mistake in approving an application was to rescind coverage for any member who did not meet plan requirements.  The Plaintiff is informed and believes and thereupon alleges that at no time during the relevant period, has Health Net ever rescinded a single plan issued in California predicated on an assertion that the insured did not reside on a continual basis in a defined California area.

44.    Health Net also alleged that claim payment may not be appropriate if improper payments (such as payment of premiums) or other consideration has been made to patients "to induce procurement of services from your facility."  However, neither federal nor California law prohibits third-party premium payment or cost sharing assistance to prospective patients. Additionally, third-party payment of premiums did not violate Health Net's ACA Plans, since those plans did not contain any provision prohibiting third party premium payments. In fact, as noted above, after the merger closed, Centene's CEO identified third party premium payments as one of several "design flaws" found in Health Net's ACA Plans and that one of the key plan changes that Centene was making was placing "restrictions on third-party premium payments, which were not included in the original 2016 offering."  As such, the conduct of Manatt, Centene and Health Net in premising all or any part of a "special investigation" on conduct which Centene and Health Net had publicly identified to its shareholders, independent financial analysts, and the DOI as being part of a plan design flaw which required alteration was clearly fraudulent.

KANTOR & KANTOR LLP
19839 Nordhoff Street
Northridge, California 91324
(818) 886 2525

45.    Health Net also developed a scheme to conceal its under-reserved substance abuse treatment claims by introducing Claims Operations User's Manual 2015-2016 Facility Behavioral Health Services for PPO Products Only, P&P 16-0014.  The pertinent sections of this manual provided instruction that Behavioral Health Services (aka substance abuse treatment) claims would be "dropped into a special queue to be worked."  The substance abuse treatment claims were to be sent through a procedure initiated by the manual which placed substance abuse treatment claims in a classic "catch 22" scenario.  Whatever information was provided by the provider went through an impossible and rigged "if- then" chart that inevitably led to denial of the claims.  If compliant medical records and authorization accompanied the claim, the claims associate was to check the "provider notes" to see if the provider had been removed from the SIU audit.  This means that all California substance abuse providers were automatically included on the SIU audit list at its inception despite the existence or non-existence of any information or evidence justifying their inclusion on the list.  It was then up to the individual substance abuse treatment provider to prove that they should be removed from the list.  In essence, they were being asked to prove a negative, which was that they had not acted fraudulently.  Each of the substance abuse treatment providers placed on the SIU list had been deemed "guilty until proven innocent."  Even if the provider had been removed from the audit list, however, the substance use disorder claim was still to be referred to the SIU, and the subject line of the transmittal was to indicate "behavioral health."

46.    In May and June 2016, Health Net made significant revisions to P&P 16-0014. Specifically, the revisions added instructions to "not pay [substance abuse] claims at 75% of billed charges," and to instead use the "Medicare percent conversion factor."  Neither members nor providers were given notice of these changes in the processing of claims.  Once again, not paying the 75% reimbursement rate and using the Medicare rate was nothing more than a component of Centene's and Health Net's

COMPLAINT

fraudulent scheme to retroactively resolve their financial problems created by their own acknowledged "plan design flaws."

47.     Perhaps Defendants' most outrageous conduct was their repeated meetings with multiple law enforcement entities and regulatory agencies, damaging the good name and reputation of the Sovereign entities.  In a power point presentation prepared by Ken Julian of Manatt, Defendants falsely accused the Sovereign entities of fraud, suggested "targets" of criminal investigations, misrepresented the contents of interviews conducted by their SIU staff, and suggested legal theories for the prosecution of criminal charges. Without having any legitimate factual basis to do so, and knowing that all of Health Net's financial problems were of its own making, Julian improperly used his connections with his former colleagues to benefit his client (Health Net) and to further its fraudulent scheme to resolve its financial problems by improperly and dishonestly attempting to place the blame for its own plan design flaws on out of network substance abuse treatment.

48.     At the urging of Defendants, on the morning of June 13, 2017, more than 100 armed guards from the FBI, U.S. Department of Health and Human Services, IRS, DHCS, and several other agencies, simultaneously executed search warrants at six Sovereign locations across southern California and the home of its CEO, Dr. Tonmoy Sharma.  Mental health patients and others recovering from substance abuse addiction, as well as their counselors, medical care providers, and Sovereign employees, were ordered to line up and physically escorted from their rehabilitative activities while government agents seized business and personal documents.  Agents, some with weapons drawn, immediately separated patients from employees, confining employees to conference rooms and lobbies and forcing patients, suffering from PTSD and anxiety, to stand outside with armed agents.  Patients and employees were searched and interrogated; cell phones were confiscated.

KANTOR & KANTOR LLP
19839 Nordhoff Street
Northridge, California 91324
(818) 886 2525

KANTOR & KANTOR LLP
19839 Nordhoff Street
Northridge, California 91324
(818) 886 2525

## DOI ISSUES ORDERS TO SHOW CAUSE

49.     The California DOI has seen through Health Net's and Centene's schemes.  On June 23, 2017, the DOI issued an Order to Show Cause ("OSC") to Health Net, stating that it had received hundreds of complaints from out-of-network substance abuse providers about Health Net's handling of claims for treatment of Health Net insureds. The OSC alleges that Health Net's refusal to honor the plan language, requiring reimbursement at 75% of billed charges, evidences unfair claims practices, violations of the Mental Health Parity Act, and unfair and/or deceptive act of practices in violation of California Insurance Code Section 790.03.

50.     Plaintiff is informed and believe that Health Net and Centene misrepresented to the DOI that it was resolving the claims of the out of network substance abuse providers.  But it has refused and failed to do so with respect to Plaintiff and others who have rightfully exercised their rights, as assignees of Health Net insureds, to pursue payment of the outstanding claims. Nevertheless, in August 2017, the California DOI withdrew the OSC.

51.     However, on July 24, 2018, the DOI issued a new OSC against Health Net, again alleging that its conduct in refusing to honor the plan language violates the law. The California DOI has added that Health Net's referral of all claims to its SIU unit "directly upon receipt of the claims payment request, prior to performing a reasonable review of the claim" and placing providers "on an audit list and then require[ing them] to prove that they should be removed from the list before any payment was made" "resulted in illegitimate denials and delayed payment of claims" and "is an unreasonable standard for the investigation and processing of claims." A true and correct copy of the July 24, 2018 OSC is attached hereto as Exhibit A.

## INTENTIONAL INTERENCE WITH
## PROSPECTIVE ECONOMIC ADVANTAGE

52.     Plaintiff incorporates by reference all paragraphs alleged above.

53.     This cause of action is brought by Plaintiff in its own right, not as assignee of its former patients.

54.     Prior to and throughout 2015, Plaintiff had an economic relationship with Health Net members who exercised their right to use their out of network benefit in obtaining mental health treatment.  Pursuant to that relationship, Plaintiff provided mental health treatment to those patients and billed Health Net for that treatment. Health Net, therefore, was aware of Plaintiff's economic relationship with its members.

55.     As described above, in late 2015 or early 2016, Health Net decided that it wanted to discourage its members from exercising their rights to utilize their out of network benefit to obtain behavioral health treatment from Plaintiff. In addition, Health Net and Centene wanted to avoid the defects in Health Net's plan designs. To accomplish these goals, Defendants engaged in the following unlawful acts, among others, designed to disrupt the relationship between Plaintiff and Health Net members:

a.     Defendants "pended" and referred all claims submitted by Plaintiff Sovereign entities and facilities to its Special Investigations Unit, prior to performing a reasonable review of the claim.  This conduct is an unreasonable standard for the investigation and processing of claims, in violation of California Ins. Code § 790.03(h)(3) & (5) and §10123.13, and Cal. Code of Regs., tit. 10, § 2695.7(d).

b.     Defendants sent Sovereign entities and facilities letters stating that payment of claims was contingent on submission of extensive documentation and attestation of certain facts, many of which were irrelevant to the processing of the claims. This conduct constituted an unlawful failure to conduct and diligently pursue a thorough, fair and objective investigation of claims and resulted in unreasonable delays and denial of legitimate claims,

KANTOR & KANTOR LLP
19839 Nordhoff Street
Northridge, California 91324
(818) 886-2525

KANTOR & KANTOR LLP
19839 Nordhoff Street
Northridge, California 91324
(818) 886 2525

1    in violation of California Ins. Code §790.03(h)(3) & (5) and §10123.13, and

2    Cal. Code of Regs., tit. 10, § 2695.7(d).

3          c.    Defendants refused to pay claims based on the clear plan

4    language, which required reimbursement at 75% of billed charges, but instead

5    substituted a bundled per diem Medicare rate for an entirely different service

6    furnished by an entirely different type of facility. This conduct was a

7    misrepresentation of the applicable plan language and resulted in

8    underpayment and unfair processing of claims, in violation of California Ins.

9    Code § 790.03(h) (3) & (5) and §10123.13, and Cal. Code of Regs., tit. 10,

10   § 2695.7(d).

11         d.    Defendants refused to pay any amount on the vast majority of

12   claims submitted by Plaintiff, despite the fact that the treatment had been

13   authorized by Health Net, in violation of California Ins. Code § 796.04.

14         e.    Defendants falsely accused the Sovereign entities of illegal

15   conduct, damaging the good name and reputation of the Sovereign entities

16   and facilities, and causing Health Net members to stop wanting to utilize

17   Sovereign facilities for their mental health treatment.

18         f.    Defendants' conduct was targeted at behavioral health providers,

19   not providers of medical/surgical benefits, in violation of Federal Mental

20   Health Parity and Addiction Equity Act of 2008, and the California Mental

21   Health Parity Act, California Ins. Code §§ 10112.27(a)(2)(D) and 10144.4.

22   56.    As a direct result of Defendants' conduct, Plaintiff  and the Sovereign

23   entities and facilities were unable to continue treating Health Net members who

24   wanted to exercise their right to use their out of network benefit.

25   57.    In 2015, the Sovereign entities were valued at approximately $625

26   million.  In 2018, as a further direct result of Health Net's conduct, Plaintiff was

27   unable to sustain their operations, and was forced to close its treatment facilities.

28

58.   Plaintiff has been damaged in an amount to be determined at trial, but which exceeds $625,000,000.00.

59.   Defendants' conduct, described herein, was intended to cause injury to Plaintiff or was carried out by Defendants with a willful and conscious disregard of the rights of Plaintiff, subjected Plaintiff to cruel and unjust hardship in conscious disregard to its rights, and was an intentional misrepresentation, deceit, or concealment of a material fact known to Defendants with the intention to deprive Plaintiff of property, legal rights, or to otherwise cause injury, such as to constitute malice oppression or fraud under California Civil Code section 3294, thereby entitling Plaintiff to punitive damages in an amount appropriate to punish or set an example of Defendants.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff prays for judgment against Defendants as follows:

1.   Damages for interference with prospective economic advantage, in an amount to be determined at the time of trial but in excess of $625,000,000, plus interest, including prejudgment interest;

2.   General damages and other incidental damages;

3.   Punitive and exemplary damages in an amount in excess of $500,000,000;

4.   Costs of suit incurred herein; and

5.   Such other and further relief as the Court deems just and proper.


Dated:  November 1, 2018                    KANTOR & KANTOR, LLP


By:___ */s/ Lisa S. Kantor*_____
     Attorneys for Plaintiff,
     Sovereign Asset Management, Inc.

KANTOR & KANTOR LLP
19839 Nordhoff Street
Northridge, California 91324
(818) 886 2525

## **DEMAND FOR JURY TRIAL**

Plaintiff Sovereign Asset Management, Inc. hereby demands a trial by jury.

Dated:  November 1, 2018                                KANTOR & KANTOR, LLP


                                                                  By:___*/s/ Lisa S. Kantor*_____
                                                                        Attorneys for Plaintiff,
                                                                        Sovereign Asset Management, Inc.

KANTOR & KANTOR LLP
19839 Nordhoff Street
Northridge, California 91324
(818) 886 2525

COMPLAINT

# EXHIBIT A

1    TERESA R. CAMPBELL, SBN:162105
     California Department of Insurance
2    45 Fremont St., 21st floor
     San Francisco, CA 94105
3    Telephone: (415) 538-4126
     Facsimile: (415) 904-5490
4
     Attorney for
5    CALIFORNIA DEPARTMENT OF INSURANCE

6

7

8                    **BEFORE THE INSURANCE COMMISSIONER**

9                        **OF THE STATE OF CALIFORNIA**

10

11

12   In the Matter of the Certificate of Authority       CDI File No. UPA-2016-00005
     of:
13                                                        ORDER TO SHOW CAUSE
     HEALTH NET LIFE INSURANCE                            (Insurance Code §§ 790.03 and 790.05); and
14   COMPANY,
                                                          NOTICE OF NONCOMPLIANCE AND
15                        Respondent.                     HEARING
                                                          (Insurance Code §§ 790.02, 790.03, and
16                                                        790.05); and

17
                                                          DEMAND
18                                                        (Insurance Code § 790.035.).

19

20        The California Department of Insurance alleges:

21

22               **JURISDICTION, PARTIES, AND APPLICABLE STATUTES**

23        1.    Respondent, HEALTH NET LIFE INSURANCE COMPANY ("Health Net"),

24   domiciled in California, holds a Certificate of Authority to transact the business of life and

25   disability insurance in the State of California, pursuant to § 700 et seq. of the California Insurance

26   Code[1].

27

28   ───────────────────
     [1] Unless otherwise stated, all references are to the California Insurance Code.

#1079904.1

2.      California Insurance Code § 700(c) provides that, after the issuance of a certificate of authority, the holder must continue to comply with all requirements set forth in the Insurance Code and all other applicable laws of this State.

3.      California Insurance Code §§ 730, 733, 734, and 790.04 authorize the Commissioner to access all records of an insurer and grant the power to examine the affairs of every person engaged in the business of insurance to determine if such person violated provisions of the Insurance Code.

4.      California Insurance Code § 790.02 prohibits any insurer from engaging in this State "in any trade practice which is … an unfair method of competition or an unfair or deceptive act or practice in the business of insurance."

5.      California Insurance Code § 790.03 defines unfair methods of competition and unfair and deceptive acts or practices in the business of insurance.

6.      California Insurance Code § 790.035 provides that any person who engages in any unfair method of competition or any unfair or deceptive act or practice defined in § 790.03 is liable to the state for a civil penalty not to exceed five thousand dollars ($5,000) for each act, or, if the act or practice was willful, a civil penalty not to exceed ten thousand dollars ($10,000) for each act. The commissioner shall have the discretion to establish what constitutes an act.

### FACTUAL ALLEGATIONS

7.      The Department has received hundreds of complaints from out-of-network residential treatment centers ("Complainants") pertaining to Health Net's handling of claims for substance use disorder treatment received in 2015 and 2016 by Health Net insureds.

8.      The services at issue were provided by the complainants to insureds covered by Health Net's 2015 and/or 2016 individual market PPO policy.

9.      For non-emergent services, the 2016 policy provides that the "Maximum Allowable Amount" is determined as follows:

- Maximum Allowable Amount for Physician services is determined by applying the 85th percentile from the database of Physician charges from the

FAIR Health RV Benchmarks or a similar type of database of Physician charges.

- For all other types of services, Maximum Allowable Amount is determined by applying a percentage of what Medicare would allow (known as the Medicare allowable amount). The Maximum Allowable Amount for such services is 190% of the Medicare allowable amount.
- In the event the applicable service or database does not include an amount for the service or supply provided, Maximum Allowable Amount shall be deemed to be 75% of the covered charges billed by the provider.

10.   Complainants also provided services to insureds covered by 2015 individual market PPO policies. The methodologies for determining the maximum allowable amount in the 2015 and 2016 individual market PPO policies for non-emergent services are identical except for the "Physician services" provision. The 2015 policy provides that "Maximum Allowable Amount for Physician services is determined by applying a designated percentile from the database of Physician charges from the FAIR Health RV Benchmarks or a similar type of database of Physician charges."

11.   Medicare does not provide a rate for inpatient or outpatient residential treatment center facility charges because such facilities are not eligible to participate in Medicare. Consequently, pursuant to the terms of the policy, Health Net should pay facility claims for inpatient and outpatient care billed by residential treatment centers based on 75% of the charges billed by the facility.

12.   Health Net paid claims for inpatient and outpatient substance use disorder services billed by residential treatment centers by substituting a bundled per diem Medicare rate for an entirely different service furnished by an entirely different type of facility.

13.   The policy language does not support Health Net's substitution methodology and Health Net's payment under this methodology is a misrepresentation of the policy terms and resulted in the underpayment and unfair settlement of claims.

14.   The complainants provided services to insureds covered by the 2015 and 2016 individual market PPO policies expecting to be paid pursuant to the express terms of those policies. However, Health Net did not pay their claims pursuant to the terms of the policy, instead using an improper methodology not supported by the terms of the policy.

3

15.     On or about January 2016, Health Net began referring all Complainants' claims to its Special Investigations Unit ("SIU") directly upon receipt of the claims payment request, prior to performing a reasonable review of the claim.  Consequently, complainants were placed on an audit list and then required to prove that they should be removed from the list before any payment was made.  Health Net's SIU sent form letters to claimants stating that payment was contingent on submission of extensive documentation concerning the claims and insureds to whom services were rendered, as well as an attestation of certain facts.  These business practices resulted in illegitimate denials and delayed payment of claims.  Referring claims requests without proper investigation is an unreasonable standard for the investigation and processing of claims.

16.     Based on the facts alleged above, Health Net's liability under the terms of the policy was reasonably clear.

## STATUTORY ALLEGATIONS
### UNFAIR CLAIMS PRACTICES

17.     The Department alleges that the acts described in paragraphs 7 through16 evidence a business practice of misrepresenting to claimants pertinent facts or insurance policy provisions relating to a coverage at issue, in violation of California Insurance Code § 790.03(h)(1).

18.     The Department alleges that the acts described in paragraphs 7 through16 evidence a business practice of failing to adopt and implement reasonable standards for the prompt investigation and processing of claims arising under its insurance policies, in violation of California Insurance Code § 790.03(h)(3).

19.     The Department alleges that the acts described in paragraphs 7 through16 evidence a business practice of failing to attempt in good faith to effectuate prompt, fair and equitable settlements of claims in which liability had become reasonably clear, in violation of California Insurance Code § 790.03(h)(5).

20.     The Department alleges that the acts described in paragraphs 7 through16 evidence a business practice of failing to conduct and diligently pursue a thorough, fair and objective investigation, and of persisting in seeking information not reasonably required for or material to

1  the resolution of a claim dispute, in violation of Cal. Code Regs., tit.10, § 2695.7(d) and

2  California Insurance Code § 790.03(h)(3) and (h)(5).

3      21.    The Department alleges that the facts alleged in paragraphs 7 through 16 herein

4  demonstrate that Health Net has engaged in acts which constitute an unfair method of competition

5  and/or unfair or deceptive acts or practices in this State, in violation of California Insurance Code

6  § 790.03. Therefore, Health Net's conduct constitutes grounds for the Commissioner to assess a

7  monetary penalty, pursuant to California Insurance Code § 790.035.

8

9  **MENTAL HEALTH PARITY ACT**

10      22.    The Department further alleges that the acts described in paragraphs 7 through14

11  evidence Health Net's failure to comply with the federal Mental Health Parity and Addiction

12  Equity Act of 2008 because it improperly applied the substitution methodology and audit

13  practices described in paragraphs 7 through16 to claims for mental health and substance use

14  disorder services, in violation of California Insurance Code §§ 10112.27(a)(2)(D) and 10144.4.

15

16  **OTHER INSURANCE CODE VIOLATIONS**

17      23.    The Department hereby notifies Health Net that, based upon the facts alleged

18  herein, Health Net is in violation of California Insurance Code §§ 700(c) and 790.02.

19

20  **NOTICE AND DEMAND PURSUANT TO**

21  **CALIFORNIA INSURANCE CODE §§ 790.035 and 790.05**

22      1. PLEASE TAKE NOTICE that the Commissioner may, as a result of the actions set

23  forth above, and pursuant to California Insurance Code § 790.035, seek monetary penalties up to:

24          a.    Five thousand dollars ($5,000.00) for each act of unfair competition or

25              unfair or deceptive practice alleged above that is proved non-willful; and

26          b.    Ten thousand dollars ($10,000) for each act of unfair competition or unfair

27              or deceptive practice alleged above that is proved willful.

28

1

2

## ORDER TO SHOW CAUSE

## PURSUANT TO CALIFORNIA INSURANCE CODE §§ 790.03 and 790.05

3    2.   WHEREAS, the Commissioner has reason to believe, based upon the facts set forth

4  herein, that Health Net has engaged in or is engaging in unfair methods of competition and/or

5  unfair or deceptive acts or practices in this State as defined in California Insurance Code

6  790.03(h);

7    3.   WHEREAS, the Commissioner has reason to believe that a proceeding by the

8  Commissioner would be in the public interest, he hereby issues the herein Order to Show Cause,

9  pursuant to California Insurance Code § 790.05, containing a statement of the charges and Health

10  Net's potential liability; and,

11    4.   THEREFORE, the Department hereby notifies Health Net that a hearing shall be held

12  at a time and place to be determined which shall not be less than 30 days after service of the

13  herein Order to Show Cause to determine whether the Commissioner should issue an Order to pay

14  the penalties imposed by California Insurance Code §§ 790.035, and cease and desist from such

15  acts or practices.

16

17    WHEREFORE, the Department prays for the following:

18    1.   An Order to Cease and Desist against Health Net from engaging in unfair methods

19  of competition and unfair and deceptive acts or practices in the business of life and disability

20  insurance in violation of California Insurance Code § 790.03; and,

21    2.   The imposition of monetary penalties against Health Net as provided by law,

22  pursuant to California Insurance Code § 790.035, of up to five thousand dollars ($5,000) for each

23  of the acts of unfair competition or unfair or deceptive acts or practices alleged above that are

24  non-willful; or up to ten thousand dollars ($10,000) for each act of unfair competition or unfair or

25  deceptive practices alleged above that are willful; and,

26    3.   The imposition of such other equitable relief, including restitution, as may be

27  necessary to redress the violations set forth above; and,

28    4.   The imposition of such further relief as may be just and proper.

#1079904.1                                                6

1

2

3

4

Dated: July 23, 2017          CALIFORNIA DEPARTMENT OF INSURANCE

5

6

7

By:   _____

8                              TERESA R. CAMPBELL
                               Assistant Chief Counsel

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

#1079904.1                                    7

| | | |
|---|---|---|
| In the Matter of the Certificate of Authority of: | ) | DECLARATION OF SERVICE BY MAIL |
| | ) | |
| | ) | |
| | ) | |
| HEALTH NET LIFE INSURANCE | ) | CDI File No. UPA-2016-00005 |
| COMPANY | ) | |
| | ) | |
| | ) | |
| | ) | |
| Respondent. | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |

I am over the age of 18 years, and not a party to this cause.

I am an employee at the Department of Insurance, State of California, employed at 45 Fremont Street, 21st Floor, San Francisco, CA 94105.

On July 24, 2018, at San Francisco, California, I sealed into an envelope and deposited in the United States mail, postage there upon fully prepaid, true copies of the following documents in the above entitled matter; the original, or a true copy, of each document served is attached hereto; said copies were addressed as follows:

C  ORDER TO SHOW CAUSE AND DECLARATION OF SERVICE were mailed to:

Greg Pimstone        BY CERTIFIED & US MAIL
Manatt, Phelps, & Phillips, LLC   7018 0360 0000 1629 6753
11355 W. Olympic Blvd.
Los Angeles, CA 90064
gpimstone@manatt.com

I declare under penalty of perjury that the foregoing is true and correct.

Executed on July 24, 2018, at San Francisco, California.

Roanne Bolanos, Declarant

#1080962 tc:rb